[Crim. No. 3407.   First Dist., Div. One.   Jan. 9, 1958.]

THE PEOPLE, Respondent, v. JOHN SILLS, Appellant.

Martin J. O'Malley, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Marvin J. Christiansen, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant and codefendant Joyce Sukarman were convicted by a jury of violation of section 11500, Health and Safety Code (possession of heroin). Defendant alone appeals from the judgment.

### QUESTIONS PRESENTED

1. Sufficiency of the evidence (a) as to heroin in defendant's eyedropper; (b) as to possession.
2. Timeliness of notice of appeal.

### FACTS

James Kane, a San Francisco motorcycle police officer, while traveling on Fulton Street, observed a man and a woman (defendant and the codefendant) enter the men's restroom of a service station. He went to the door and found it locked. At his request the attendant opened the door. Entering, Kane saw Joyce standing in the rear of the washroom with an open

pocket knife in her hand. Defendant, with a hypodermic needle attached to an eyedropper in his hand, backed up and stepped behind the door. The eyedropper contained a colorless fluid. On the top of the toilet was a rolled up matchbox cover bound with pink thread. In defendant's overcoat pocket the officer found a measuring spoon, slightly black on the bottom. Plaintiff's expert testified that these objects were parts of an addict's outfit, the spoon being used to warm the heroin solution, the needle and dropper to inject the heroin. The rolled up matchbox cover is used to hold the needle. Officer Kane testified that a knife is used by addicts to open a hole in the arm. Joyce asked Kane for the contents of the dropper, saying that she had not had a shot in some time. Joyce also said that defendant was not an addict and not to blame him as it was all her fault.

Defendant testified that he had been living with Joyce; that after giving her money to see a doctor, he left home for work; that while waiting for a bus at a transfer point he saw Joyce coming out of Foster's. He went up to her and asked what she was doing. She said she was sick. She wanted to go to a restroom, although he tried to persuade her to go home. He followed her into the men's room of the service station, without saying anything about it being the men's room. He locked the door at her request. She said she needed narcotics. He tried to dissuade her. She started preparing the narcotic. She wet a little powder which she had in a piece of paper, scraped it off with a knife into a spoon and added water. She then drew it up with the eyedropper, to which she had attached the needle, both of which she took out of her pocket. She then laid the needle and dropper on the tank of the toilet. She pulled up her coat sleeve. Defendant then picked up the dropper. At that moment the door was opened and the officer walked in. Defendant did not back up and step behind the door. Defendant was already by the door. The officer asked defendant what he was hiding in his hand. Defendant said "an eye dropper with some narcotics" which he took from Joyce to keep her from using.

### 1. (a) *Heroin in the Dropper.*

■ Defendant contends the prosecution failed to prove that the liquid in the dropper contained heroin. The prosecution carelessly neglected to couple up the articles found by Kane in the washroom with those testified to by the narcotics expert. Kane testified to there being a colorless liquid in the dropper. The expert testified that he was given a sealed box

by the police property clerk. In it was a test tube containing a solution of heroin, an eyedropper with needle attached, a matchbox cover bound with pink thread, and a measuring spoon. The tube was then marked People's Exhibit 1 for identification, the box People's Exhibit 2 for identification, the eyedropper with needle attached and the matchbox, People's Exhibit 3 for identification, and the spoon People's Exhibit 4 for identification. Later during Officer Kane's testimony, all of the objects except the test tube were admitted in evidence without objection, bearing the same exhibit numbers respectively as for identification.

It is apparent that everyone at the trial, judge, counsel and the defendant, assumed that there was no question about the liquid in the dropper being a heroin solution and that there was no issue raised on the subject. Defendant at no time objected to the expert testifying as to the contents of the test tube, nor ever made the contention in the trial court that the heroin character of the liquid in the dropper had not been proved. In fact, in defense counsel's statement to the jury at the end of plaintiff's case, he said that he would prove that defendant "at the time he was found with the *narcotics* in his hand" (emphasis added) was attempting to prevent Joyce from using them. He repeated "using the narcotics." Defendant himself testified that he told the officer "I got an eye dropper with some *narcotics*" (emphasis added) and that he had no idea where Joyce was getting *narcotics*. On cross-examination he was asked without objection if he had purchased "that heroin" for her. He said he had not. Counsel for the codefendant stipulated that the contents of the dropper contained heroin. Defendant's counsel said nothing.

The record shows that throughout the trial defendant was not only not contending that the dropper did not contain narcotics but was contending that it did and that he took the dropper to keep Joyce from using it. Defendant contends that his reference to narcotics must be disregarded because he was not a user and it was not shown that he was an expert on the subject. He never claimed that when he stated it was a narcotic that he did not know what it was. His admission was therefore enough in itself to show the character of the contents of the dropper. Moreover, he testified that he had been living with Joyce for over two years. A reasonable inference is that living with an addict he would know what she intended injecting into her veins.

In addition to the facts above related which were sufficient to prove the narcotic character of the contents of the dropper, defendant's failure to object to the chemist's testimony and to raise this question in the trial court precludes him from doing so now. (See *People* v. *Coleman,* 100 Cal.App.2d 797, 802 [224 P.2d 837].) The plaintiff's failure to introduce into evidence the test tube containing the heroin is unimportant. "Introducing it in evidence would have assisted the jury in no way." (*Idem,* p. 802.)

1. (b) *Possession.*

Defendant contends that he did not have possession of the narcotics within the meaning of section 11500, Health and Safety Code, on the theory that he was trying to prevent Joyce from using it. Actually he did have physical possession of it and what he is really contending is that there was shown no intent to violate the law by his possession. Such an intent does not have to be shown in violations of section 11500.

Moreover, as " '. . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence . . .' " (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]), in spite of defendant's assertion that he was trying to prevent Joyce from using the heroin, a reasonable inference from the evidence (and probably the *most reasonable* inference), is that he was aiding Joyce in taking an injection. He entered the restroom with her without pointing out that it was a *men's* room. He locked the door at her request. He watched her go through all of the steps in preparation for an injection of heroin and made no effort to physically stop her. It would have been a simple thing to hit the spoon spilling its contents. It was not until after she had filled the dropper and bared her arm for the injection, that he picked up the dropper. She had the knife in her hand, apparently to make the opening in her arm into which it may reasonably be inferred that he was going to make the injection. Possession was amply shown by the evidence.

2. *Notice of Appeal.*

The People contend that defendant's notice of appeal was filed too late. Judgment was pronounced against defendant April 26, 1957. The notice of appeal, dated May 1, was filed May 7, one day beyond the statutory 10 days provided for filing notice of appeal. (Rule 31, Rules on Appeal.) Defendant filed an affidavit that on May 1 he wrote the notice

of appeal while confined in San Quentin and that day delivered it to the prison statistical clerk for mailing; that in so doing he conformed to prison regulations for forwarding mail by inmates. The affidavit of the statistical clerk at Chino stated that defendant's file showed a copy of a letter dated May 1, 1957, addressed to the superior court clerk at San Francisco with the notation "Original mailed 1 May 1957, W. C. Schiller"; that Schiller's position at San Quentin is not known to affiant; that the prison card recording mail forwarded on behalf of defendant shows that said letter was processed through the mail office on May 3; that the file does not reflect what means was used to forward said letter.

There was no contradiction of the averments of these affidavits. Thus it appears that defendant as a prison inmate did all in his power to file the notice of appeal by delivering it to the prison officials in ample time for it to be forwarded and received by the court clerk within the statutory period. ██ ". . . when appellant timely deposited his notice of appeal with the state's employees as required by the state prison rules, such action constituted a constructive filing of the specified notice." (*People* v. *Slobodion* (1947), 30 Cal. 2d 362, 367 [181 P.2d 868].)

Judgment affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.